**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MARISSA M. MONTANEZ,      :          No. 4:14-CV-00553
                             :
          Plaintiff,      :          (Judge Brann)
                             :
       v.                 :
                             :
MISSOURI BASIN WELL      :
SERVICES, INC.,           :
                             :
          Defendant.     :

## MEMORANDUM OPINION

### AUGUST 28, 2017

Before the Court for disposition is Defendant Missouri Basin Well Services, Inc.'s Motion for Summary Judgment. In accordance with the reasoning set forth below, this Motion will be granted in its entirety.

## I.    INTRODUCTION

Plaintiff Marissa M. Montanez ("Ms. Montanez") commenced this action on March 24, 2014 against Defendant Missouri Basin Well Services, Inc. ("MBWS"). In her original Complaint, Ms. Montanez alleged four claims of employment discrimination: (1) gender and national origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) age discrimination and retaliation under the Age Discrimination in Employment Act of 1967; (3) disability discrimination and retaliation under the Americans with Disabilities Act ("ADA");

and (4) age, gender, and disability discrimination under the Pennsylvania Human Relations Act.[1] MBWS thereafter filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and Ms. Montanez responded by filing an Amended Complaint as a matter of course.[2] MBWS renewed their Motion to Dismiss on July 28, 2014, and asked to dismiss the Amended Complaint in its entirety for failure to state a claim upon which relief can be granted.[3]

On April 10, 2015, I issued a Memorandum Opinion and accompanying Order which partially granted MBWS's motion, and granted Ms. Montanez leave to file a second Amended Complaint correcting the outlined deficiencies.[4] Ms. Montanez subsequently filed an Amended Complaint limited to claims of (1) gender and national origin discrimination and retaliation in violation of Title VII; (2) disability discrimination and retaliation in violation of the ADA; and (3) discrimination and retaliation in violation of the Pennsylvania Human Relations Act.[5] MBWS thereafter answered, and the parties commenced factual discovery.[6]

---

[1]    ECF No. 1.

[2]    ECF Nos. 11 & 15.

[3]    ECF No. 16.

[4]    ECF Nos. 23 & 24.

[5]    ECF No. 25.

[6]    ECF No. 28.

Following the completion of discovery, MBWS filed a Motion for Summary Judgment seeking the entry of final judgment in their favor on all claims.[7] This Motion has since been fully briefed, and is now ripe for disposition.[8]

## II.     FACTUAL BACKGROUND

### A.     October 11, 2011 – November 22, 2011: Ms. Montanez's Employment at Missouri Well Basin Services Begins and She requests a Transfer to the Water Transport Division.

On October 1, 2011, Plaintiff Marissa Montanez began working for Defendant MBWS as a "sand hauler" after it acquired her former employer, Old West Oilfield Services.[9] On November 22, 2011, Ms. Montanez requested a transfer to the Water Transport Division in Pennsylvania.[10] MBWS, however, did not employ drivers in the Water Transport Division in Pennsylvania.[11] Rather, all drivers within that division were non-employee independent contractors.[12] Ms. Montanez was advised that such a transfer was impossible.[13] She thereafter

---

[7]   ECF No. 43.

[8]   ECF Nos. 47 & 50.

[9]   Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF") (ECF No. 44) ¶ 2, at 1; Pl.'s Answer to Def.'s Statement of Undisputed Material Facts ("Pl.'s Answer") (ECF No. 51) ¶ 2, at 2.

[10]  Def.'s SUMF ¶ 4, at 1; Pl.'s Answer ¶ 4, at 2. *See also* November 22, 2011 Email from Marissa Montanez to Sara Boltz (ECF No. 50-9).

[11]  Def.'s SUMF ¶ 5, at 2; Pl.'s Answer ¶ 5, at 2.

[12]  Def.'s SUMF ¶ 6, at 2; Pl.'s Answer ¶ 6, at 2.

[13]  Def.'s SUMF ¶ 7, at 2; Pl.'s Answer ¶ 7, at 2; *see also* Dep. of Sarah Boltz (ECF No. 44-2) at 37:20–38:3.

inquired about transfer to another division in another state.[14] Human Resources

Manager of MBWS Sarah Boltz responded by email on November 23, 2011 with

following message:

> You can find a list of available and open positions by visiting our
> website, www.missouribasinwell.com and clicking "Apply Online."
> I've attached a Transfer Request Form, all transfer requests are
> reviewed by management for qualifications, experience, etc. and must
> receive executive approval.[15]

The factual record contains no evidence that Ms. Montanez made such a transfer

request and was subsequently denied.

**B.    November 30, 2011: Ms. Montanez Makes An Internal Complaint
of Workplace Harassment. Following An Investigation By Third
Party Investigator Bernard E. Howard, Said Complaint Is Found
to be Unsubstantiated.**

Thereafter, on November 30, 2011, Ms. Montanez made an internal

complaint to Ms. Boltz that she was being subjected to a gender-based hostile

working environment by Sand Coordinator Milton Drake ("Mr. Drake") and

Operations Manager Don Smith ("Mr. Smith").[16]  Upon receiving this internal

complaint, two actions were taken.  First, MBWS suspended Mr. Drake with pay

pending an investigation.[17]  Second, MBWS hired a third party, Bernard E.

---

[14]   *See* November 23, 2011 Email Correspondence Between Sarah Boltz and Marissa Montanez
(ECF No. 44-1).

[15]   *Id.*

[16]   Def.'s SUMF ¶ 3, at 1; Pl.'s Answer ¶ 3, at 2. *See also* November 30, 2011 Email from
Marissa Montanez to Sarah Boltz (ECF No. 50-10).

[17]   Def.'s SUMF ¶ 8, at 2; Pl.'s Answer ¶ 8, at 2.

Howard ("Mr. Howard"), to investigate these claims.[18]  During the course of this investigation, Mr. Howard interviewed Ms. Montanez; Jason Drake, son of Mr. Drake and a fellow sand pusher; Milton Drake; and Don Smith.[19]

This internal complaint concerns the following factual scenario.  On November 30, 2011, Ms. Montanez received a text message from Mr. Drake, a Sand Coordinator, which stated the following: "This pad is very difficult to maneuver in. Billy's site would probley (sic) be easier for you. Have you called Billy?"[20] Ms. Montanez responded to Mr. Drake, saying "That is a very interesting statement. Do you tell ur MALE drivers when the pad is difficult 2 manuever (sic) in? I will be sure to call."[21] A follow-up text message from Mr. Drake stated "come try it. Nothing personal, just trying to make it easy on you, and Billy needs drivers, where I am good with the number I have."[22]  Once on the dump site, Ms. Montanez alleged that she was approached by Jason Drake, who asked her to "line jump" and offload her sand before others who had arrived at the site prior to her.[23]  Later, when she fell on the job site, Mr. Drake brought her a first aid kit, but indicated

---

[18]  Def.'s SUMF ¶ 9, at 2; Pl.'s Answer ¶ 9, at 2.

[19]  *See* Stathill Investigations Report by Bernard E. Howard (ECF No. 50-16).

[20]  *See* Stathill Investigations Report by Bernard E. Howard (ECF No. 50-16), at 2; *see also* Dep. of Marissa Montanez (ECF No. 44-3) at 24:22–24.

[21]  *Id.*

[22]  *Id.*

[23]  *Id.*

that he did not have the proper paperwork for her concerning job site injuries.[24]

Based on these circumstances, Ms. Montanez later reported to Don Smith that there were "two (2) things he needed to do": (1) based on the allegations of co-worker, investigate why "Jeff"[25] and Milton Drake were having a derogatory conversation about her, and (2) initiate a workers' compensation claim.[26]

Mr. Howard's investigation concluded on December 20, 2011 with a finding that "[t]here is insufficient evidence to support any claim of sexual bias toward the Complainant."[27] The report compiled by the Investigator included the following additional factual findings:

> 3. MBI employees Milton E. DRAKE & Jason Douglas DRAKE performed their duties in a professional manner with regard to their conduct and contact with Complainant at the job site on 11/30/2011.

> 4. The Complainant voluntarily refused medical attention at the job site scene and again later at the MBI Offices in Williamsport, PA. She instead choose to drive five (5) hours to her home in Ohio. There she sought advice from a Nutritionist before going to a hospital. Her injuries were minor.

> 5. The limited number of printed copies of text messages supplied by the Complainant tend to support the position of MBI

---

[24] Def.'s SUMF ¶¶ 13-14, at 3; Pl.'s Answer ¶¶ 13-14, at 3; see also Dep. of Marissa Montanez (ECF No. 44-3) at 28:5-8; 16-25.

[25] Jason Drake is referred to as "Jeff" by Ms. Montanez in Mr. Howard's Investigative Report. *See* ECF No. 50-16.

[26] *See* Stathill Investigations Report by Bernard E. Howard (ECF No. 50-16), at 4.

[27] *See* Stathill Investigations Report by Bernard E. Howard, Factual Findings, (ECF No. 50-16).

> Supervisor Milton DRAKE rather than the Complainant. They
> do not support a claim of sexual bias.[28]

While Ms. Montanez alleges that she was told by another driver that Milton Drake did not want a female on his site,[29] she nevertheless admitted during her deposition that she never heard him say anything derogatory about her or her gender. Ms. Montanez specifically stated the following:

> Q.    . . .
> Had you ever heard of Milton Drake making similar statements like that in the past, that he did not want a woman on certain job sites?
>
> A. No.
>
> . . .
>
> Q. The comments that Milton Drake had made to Abe, that Abe had related to you that Milton did not want women on the pad site, did you hear Milton Drake say that?
>
> A. No.[30]

A full examination of the factual record reveals no evidence of such comments.[31]

---

[28]  *Id.*

[29]  Pl.'s Answer ¶ 16, at 3 (citing Dep. of Marissa Montanez (ECF No. 44-3), at 29:24–30:4).

[30]  Dep. of Marissa Montanez (ECF No. 44-3) at 31:7-10; 32:21-25.

[31]  *See* Dep. of Matthew Baker (ECF No. 44-6) at 12:19-22(stating that he never heard Milton Drake make disparaging comments about Ms. Montanez); Dep. of Jason Drake (ECF No. 44-5) at 62:16–63:3 (stating that he does not recall anyone saying that Ms. Montanez could not do her job because she was a woman or that she should be retaliated against because she made a complaint); Dep. of Don Smith (ECF No. 44-7) at 23:6-11 (stating that he does not recall any instance of Milton Drake making a negative comment about Ms. Montanez).

**C.    In December of 2011, Ms. Montanez Expressed Interest in a Sand Coordinator Position.  She Ultimately Was Not Chosen For This Position.**

On or about December 2011, Ms. Montanez inquired about transferring to a Sand Coordinator position.[32]  She ultimately was not selected for this position.[33] Mr. Smith, in consultation with Ms. Boltz, described the reasoning for this decision as follows:

> Q. Do you recall the substance of the conversation?
>
> A. I know that she -- I know -- actually it was asked if I thought she qualified to be a sand coordinator.
>
> Q. Do you recall who asked that question?
>
> A. I believe it was Sarah.
>
> Q. Okay. And what was your answer?
>
> A. At that -- at that time I had expressed a concern about her scheduling, her availability to work as much as the job required. That's a job where people generally work out there for multiple weeks at a time.[34]

Indeed, in Mr. Howard's December 9, 2011 Investigative Report referenced above, Ms. Montanez herself was quoted as stating that "she is limited in the number of hours she is permitted to work per month.[35]

---

[32]    Am. Compl. (ECF No. 25) ¶ 38, at 8.

[33]    Dep. of Sarah Boltz (ECF No. 44-2), at 38:23-24.

[34]    Dep. of Don Smith (ECF No. 44-7), at 16:14-23.

[35]    *See* Stathill Investigations Report by Bernard E. Howard (ECF No. 50-16), at 2.

**D. Ms. Montanez Is Delayed in Reaching the "Stubble" Site of MBWS's Customer, Schlumberger, and A Ticket Charging Schlumberger for Lost Time and Mechanical Issues Is Improperly Submitted.**

On January 19, 2012, Ms. Montanez was dispatched to deliver sand to the "Stubble" site for MBWS's customer—Schlumberger.[36] While the parties disagree as to the root cause,[37] Ms. Montanez was delayed in arriving at the Stubble site. In her deposition, Ms. Montanez stated the following concerning the cause:

> Q. Okay. So from midnight to 10:00 a.m., that's ten hours. What occurs in that ten-hour period?
>
> A. I was calling Will trying to get directions.
>
> Q. Okay. Were you having any mechanical troubles with the truck?
>
> A. I had brake problems with the truck that night. They froze up.
>
> Q. Tell me about the brake problems. Do you remember what time that happened?
>
> A. It happened right after Will called me; and for about an hour, it took me to get my brakes unstuck.[38]

Following this lost time, a ticket was submitted to MBWS's customer—Schlumberger—which charged for the above lost time and mechanical problems.[39]

---

[36] Def.'s SUMF ¶ 24, at 4; Pl.'s Answer ¶ 24, at 4.

[37] While Ms. Montanez avers that she was given the incorrect directions to the site, MBWS cites her deposition testimony to demonstrate that she was given the correct directions but chose not to follow them because they would force her to make a 90 degree turn. *See* Def.'s SUMF ¶ 26, at 4; Pl.'s Answer ¶ 26, at 4. *See also* Dep. of Marissa Montanez (ECF No. 44-3), at 49: 9-12 ("Q. I get it. Instead of making a 90-degree sharp turn, they had an easier angle to make to get onto that road? A. Right.").

[38] Dep. of Marissa Montanez (ECF No. 44-3), at 51:11-24.

This act of charging a customer for lost time and time dealing with mechanical issues is not permitted.[40] Rather, a customer may only be charged for delays which the customer causes, which is called "detention time."[41] Don Smith indicated in an email to Sarah Boltz and Charles Steffan that he warned Ms. Montanez concerning this billing practice.[42]

Following the "Stubble" site incident, Ms. Montanez was banned from working at all Schlumberger job sites,[43] and Sarah Boltz undertook an investigation to confirm the findings of Schlumberger.[44] This investigation confirmed the conclusion of Schlumberger concerning improper billing.[45] Thereafter, because Schlumberger was MBWS's only customer in Pennsylvania and no other position

---

[39] Def.'s SUMF ¶ 29, at 5; Pl.'s Answer ¶ 29, at 5. Plaintiff alleges within her deposition that co-worker Sanders added commentary to her ticket in order to "get her fired." *See* Dep. of Marissa Montanez (ECF No. 44-3), at 55:3–20. Assuming the veracity of this claim (as the ticket is not included in the factual record), the significance of these modifications is limited as there is no allegation that the detention time charged was changed. *See id.* at 57:20–58:12. In any event, she made this claim to MBWS concerning Sanders and an independent investigation revealed no evidence confirming this suspicion. *See* Investigative Report of February 23, 2012 (ECF No. 50-20), at 16.

[40] Def.'s SUMF ¶ 30, at 5; Pl.'s Answer ¶ 30, at 5.

[41] Dep. of Matthew Baker (ECF No. 44-6) at 24:20–25:9; Dep. of Milton Drake (ECF No. 44-4) at 49:11-20; Dep. of Don Smith (ECF No. 44-7) at 41:7-13.

[42] Def.'s SUMF ¶ 31, at 5; Pl.'s Answer ¶ 31, at 5. *See also* Email Chain from Don Smith to Charles Steffan and Sarah Boltz (ECF No. 44-1).

[43] Def.'s SUMF ¶ 32, at 5; Pl.'s Answer ¶ 32, at 5.

[44] Def.'s SUMF ¶ 34, at 6; Pl.'s Answer ¶ 34, at 5.

[45] *Id.*

was available, Ms. Montanez was placed on administrative suspension by MBWS.[46]

### E. Ms. Montanez Reveals That She Is Suffering From Multiple Sclerosis And Requests Accommodations From MBWS.

Ms. Montanez suffers from multiple sclerosis, and has symptoms of fatigue, intermittent hand numbness, and tingling.[47] On January 19, 2012, Ms. Montanez requested an accommodation from MBWS—to be permitted to use regular snow chains when driving rather than double chains.[48] This request came as a result of MBWS's change of policy from a requirement of single chaining to double chaining of tires.[49] Ms. Montanez's doctor, Robert Fox, twice reported that Ms. Montanez was able to perform this task.[50] However, in a March 24, 2012 letter to MBWS, Dr. Fox backtracked with the following language:

> She is able to operate a commercial motor vehicle with the following restrictions: no heavy lifting (greater than 75 pounds) **and no double chaining of truck tires**.[51]

Sarah Boltz, a Human Resources employee for MBWS, stated the following concerning Ms. Montanez's continued employment in the wake of this email from

---

[46] Def.'s SUMF ¶ ¶ 33, 35, at 6; Pl.'s Answer¶ ¶ 33, 35 at 5–6.

[47] Am. Compl. (ECF No. 25) ¶¶22–23, at 6.

[48] Def.'s SUMF ¶ 40, at 7; Pl.'s Answer ¶ 40, at 6.

[49] *See* Dep. of Marissa Montanez (ECF No. 44-3) at 74:13–17.

[50] Def.'s SUMF ¶¶ 45-46, at 7; Pl.'s Answer ¶¶ 45-46, at 7.

[51] *See* Def.'s SUMF ¶ 47, at 7–8; Pl.'s Answer ¶¶ 47, at 7. See also March 14, 2012 Email from Robert Fox, M.D. (ECF No. 44-1), at 6.

Dr. Fox and the need for more information to determine Ms. Montanez's ability to

safely work as a truck driver:

> Q. Was it an indefinite suspension?
>
> A. Until we received the information that we needed ---.
>
> Q. And what ---?
>
> A. --- and verification.
>
> Q. And what information was that that you needed?
>
> A. There were, as I mentioned previously, some inconsistencies that
> we wanted to clear up or get more information on.[52]

Ms. Montanez did not produce this information.  Indeed in an email from Sarah

Boltz to Ms. Montanez sent months later on September 26, 2012, Ms. Boltz stated

the following concerning the need for additional information and the potential for

Ms. Montanez to be placed in an alternative position:

> You state there is a misunderstanding but that you will not be
> able to provide additional information until December 2012. I
> assume you are referring to what your medical provider
> described as "transient episodes of visual blurring" and "a black
> hole" that requires you to pull your vehicle over to the side of
> the road and sleep for about one hour. As I stated in my e-mail,
> this creates a serious safety issue. **However, we will wait to
> receive more information from your provider before**

---

[52] Dep. of Sarah Boltz (ECF No. 44-2) at 48:2–10. *See also* September 26, 2012 Email from Sarah Boltz to Marissa Montanez (ECF No.50-21)("At this point, without a non-driving position available, we will need to keep you on leave until we receive the additional information from you and your provider.").

> **making a final determination on whether you can be asked to drive while on the job.**[53]

**F.    Ms. Montanez Files A Complaint With the EEOC in June 2012. She Is Subsequently Given A Job As A Field Safety Representative On July 9, 2012.**

On June 1, 2012, Ms. Montanez filed an EEOC complaint alleging discrimination based on sex, national origin, retaliation, age, and disability.[54] Thereafter, on July 9, 2012, MBWS attempted to accommodate Ms. Montanez by placing her in a Field Safety Representative ("FSR") position.[55] This placement required that MBWS send Ms. Montanez to North Dakota for one week of training.[56] On July 25, 2012, after less than three weeks on the job, Ms. Montanez requested a leave of absence, following what she avers was retaliatory conduct by another FSR—Vincent Zales.[57] Ms. Montanez avers that she was provided incorrect information about where and when she needed to be on a particular date.[58] Specifically, in her deposition, Ms. Montanez alleged the following:

> A.     . . .
>
> I asked Vince about -- I had a vehicle that was supposed to be issued to me, and I was -- I had taken my personal vehicle up to Morris, which is where the office was at the time. The MBI vehicle that was

---

[53]   *See* September 26, 2012 Email from Sarah Boltz to Marissa Montanez (ECF No.50-21).

[54]   Def.'s SUMF ¶ 48, at 8; Pl.'s Answer ¶ 48, at 7.

[55]   Def.'s SUMF ¶ 49, at 8; Pl.'s Answer ¶ 49, at 7.

[56]   Def.'s SUMF ¶ 50, at 8; Pl.'s Answer ¶ 50, at 7.

[57]   Def.'s SUMF ¶ 51, at 8; Pl.'s Answer ¶ 51, at 7.

[58]   Def.'s SUMF ¶ 52, at 8; Pl.'s Answer ¶ 52, at 7.

issued to me was still up in Morris, and I had to -- we had to work out a way to get the vehicle from Morris to West Virginia so I could use it when I was doing my job as a field safety rep.

And I asked - - so Vince made a -- he sent me a schedule one day, and then we made arrangements for me to pick up the vehicle in Wheeling.

So I pick up the vehicle -- or I pick up the rental and drive to Morris and then get to Morris, drop off the rental vehicle, and pick up the FSR vehicle, which was supposed to be left for me in Williamsport, drive it back and go home.

The next day I'm scheduled to work. So I show up at the truck stop, and I'm waiting for Vince; and he never shows up.

So then I said, you know: Is there any reason why you're not here?

And he's, like: Where are you at?

I said : I'm at the TA. Was I supposed to meet you--

I wasn't sure if I was supposed to meet him at the car rental place. He's like: What are you doing there? You were supposed to stay in Morris.

And I said: You didn't tell me I was supposed to stay in Morris.

So him and Don come out, and Vince is yelling at me; and he wanted a copy of my ticket. And I was like, well, I'm not giving you -- because he was telling me that I had violated Federal Motor Carriers Safety Rules by driving. Because even though it was a pickup truck, he was saying this pickup truck was regulated by PHMSA rules and you can't drive more than 14 hours without taking a ten-hour break.[59]

. . .

---

[59]   Dep. of Marissa Montanez (ECF No. 44-3), at 63:21–65:11.

> And then Don comes out, and he reiterates -- he says: In either case, you must be tired. Go home.[60]

Based on this incident alone, Ms. Montanez came to the conclusion that she was not going to be permitted to do this job and requested a leave of absence, stating specifically:

> A.      . . .
>
> So I went home, but I -- at that point, I just realized that they weren't going to allow me to do my job as an FSR.
>
> Q. Okay.[61]

### G.  Ms. Montanez Resigns From Her Position As A Field Safety Representative. She Formally Resigns From Employment by MBWS In January 2013.

Following Ms. Montanez's departure as FSR, she remained an employee with MBWS as they awaited supplemental documentation concerning her ability to perform the essential functions as a truck driver.  Indeed, in the previously referenced email from Sarah Boltz to Ms. Montanez on September 26, 2012, Ms. Boltz wrote the following:

> At this point, without a non-driving position available, we will need to keep you on leave until we receive the additional information from you and your provider.[62]

---

[60]  *Id.* at 65:21–23.

[61]  *Id.* at 65:24–66:2.

[62]  *See* September 26, 2012 Email from Sarah Boltz to Marissa Montanez (ECF No. 50-21).

There is no record that Ms. Montanez provided that additional documentation. On January 9, 2014, MBWS received notice that she had resigned her position.[63]

## III. LAW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[64] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[65] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[66]

"A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[67] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[68]

---

[63] Def.'s SUMF ¶ 53, at 8; Pl.'s Answer ¶ 53, at 7.

[64] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[65] Fed. R. Civ. P. 56(a).

[66] *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex Corp.*, 477 U.S. at 322).

[67] *Clark*, 9 F.3d at 326.

[68] *Id.*

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[69] Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[70] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[71] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[72] Summary judgment therefore is "where the rubber meets the road" for a plaintiff, as the evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

---

[69] *Liberty Lobby, Inc.*, 477 U.S. at 252.

[70] *Id.*

[71] *Id.*

[72] *Id.* (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[73] "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[74]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[75] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[76]

---

[73]  *Celotex Corp.*, 477 U.S. at 323 (internal quotations omitted).

[74]  *Id.*

[75]  *Liberty Lobby, Inc.*, 477 U.S. at 250.

[76]  Fed. R. Civ. P. 56(c)(1).

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[77] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[78] On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."[79]

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[80] "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[81] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[82]

---

[77] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[78] Fed. R. Civ. P. 56(e)(2).

[79] Fed. R. Civ. P. 56(c)(3).

[80] *Liberty Lobby, Inc.*, 477 U.S. at 249.

[81] *Id.*

[82] *Id.* at 249–50 (internal citations omitted).

## IV. ANALYSIS

### A. Ms. Montanez's Gender Discrimination and Retaliation Claims Under Title VII[83]

#### 1. Title VII Gender Discrimination

Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, provides that "[i]t shall be an unlawful employment practice . . . to discriminate against any individual . . . because of . . . sex."[84] The United States Supreme Court has "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases."[85] That analysis proceeds as follows:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." (citation omitted). Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[86]

---

[83] I note that in Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, she withdraws her Title VII discrimination claim to the extent it is based on national origin. ECF No. 50, at 2 n. 1.

[84] 42 U.S.C. § 2000e 2(a)(1).

[85] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[86] *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting *McDonnell Douglas*, 411 U.S. at 802).

MBWS contends that it is entitled to summary judgment on Ms. Montanez's gender discrimination claim because there is no genuine dispute as to material fact at any stage of the above delineated *McDonnell-Douglas* framework. I agree.

a.    *Prima Facie* Case

First, MBWS argues that Ms. Montanez has failed to adduce evidence establishing a prima facie case of gender discrimination. Although the elements of a *prima facie* case "depend on the facts of the particular case," a plaintiff in a Title VII discrimination case must generally demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered from some form of adverse employment action; and (4) those actions were taken under circumstances that give rise to an inference of unlawful discrimination.[87] In this analysis, the focus "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'"[88] Therefore, the plaintiff must produce "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII."[89] This determination is question of law to be made by the court.[90]

---

[87] *Id.* at 410–11.

[88] *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

[89] *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999).

[90] *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

Here, while it is undisputed that Ms. Montanez's identity as a woman satisfies the first element of the prima facie case—membership in a protected class, the parties disagree over whether there remains a genuine dispute of material fact concerning the other three elements. In her brief in opposition to MBWS's motion for summary judgment, Ms. Montanez alleges that she has presented sufficient evidence creating a genuine dispute as to material fact based on the following adverse employment actions: (1) MBWS's failure to transfer her to transfer her to its Water Transport division; (3) MBWS's failure to transfer to the Sand Coordinator Position; (3) MBWS's failure to pay her for detention time resulting from what she avers was sabotage in form of incorrect directions; and (4) MBWS's placement of her on "administrative leave" without pay on January 22, 2012.[91] However, even when viewing the evidence in the light most favorable, each of these events fail as a matter of law to satisfy a *prima facie* case.

Ms. Montanez first alleges that she was subjected to an adverse employment action as a result of gender discrimination when she requested and was denied a transfer to MBWS's Water Transport Division in Pennsylvania on November 22, 2011.[92] MBWS, in turn, argues that this denial fails to constitute an adverse employment action because it is does employ drivers in this division within

---

[91] Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. (Pl.'s Br.) (ECF No. 50) at 5–7.

[92] *Id.* at 6. *See also* November 22, 2011 Email to Sarah Boltz (ECF No. 50-9)("Therefore, I am currently inquiring into a transfer to the Water Transport division of Missouri Well Basin Services within the Pennsylvania Area.").

Pennsylvania.[93]  Viewing the evidence in the light most favorable to Ms.

Montanez, I find that this denial fails to constitute an adverse employment action

for two specific reasons.  First, review of the factual record reveals that, although

Ms. Montanez was denied such a transfer, MBWS did not employ water drivers in

Pennsylvania, and any in-state transfer was therefore impossible.[94]  This

impossibility was acknowledged by Ms. Montanez in an email to MBWS's Human

Resources Manager Sarah Boltz.[95]  Second, while there is evidence that MBWS

employed such drivers in North Dakota and that Ms. Montanez expressly inquired

as to the possibility of such a transfer,[96] the record is devoid of facts showing that

she pursued such a transfer, a position was available for her, and she was

subsequently denied.

Ms. Montanez also avers that she was subject to an adverse employment

action as a result of her gender when her requested transfer to a Sand Coordinator

position was denied in December 2011.[97]  MBWS, while conceding that Ms.

Montanez was considered and rejected for this position, argues that Montanez

---

[93]   Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.")(ECF No. 47) at 9–10.

[94]   *See* Dep. of Sarah Boltz (ECF No. 44-2) at 37:20-38:16 (Q. Did you transfer her to that division? A. We do not have company water drivers. We only had independent contractors in Pennsylvania. Q. So is it your testimony that there wasn't a  position for her at all? 6 A. In Pennsylvania; yes.).

[95]   *See* Email Chain between Sarah Boltz and Marissa Montanez (ECF No. 44-1), at 1.

[96]   *Id.*

[97]   Pl.'s Br. at 6–7.

failed to establish a *prima facie* of gender discrimination because again there is no evidence that she was qualified for this position which would require her to live at the oil site for weeks at a time.[98] This lack of qualification was confirmed in Mr. Howard's December 9, 2011 Investigative Report referenced above where Ms. Montanez was herself quoted as stating that "she is limited in the number of hours she is permitted to work per month."[99]

Furthermore, qualifications aside, there nevertheless remains an independent obstacle preventing the satisfaction of a *prima facie* case based on either MBWS's failure to transfer Ms. Montanez to the water transport division or the sand coordinator position. In cases where an employee seeks a transfer to a new position within the same organization, courts require that the employee demonstrate that the transfer sought would have resulted in a promotion, *i.e.,* that the position was objectively better than his or her current position.[100] In *Swain v. City of Vineland,* the United States Court of Appeals for the Third Circuit affirmed a district court's issuance of summary judgment in favor of the defendant where the plaintiff had failed to produce any evidence that he suffered an adverse employment action.[101] In that case, the plaintiff, a sergeant in the

---

[98]   Def.'s Br. at 10; *see also* Dep. of Don Smith (ECF No. 44-7), at 16:20-23.

[99]   *See* Stathill Investigations Report by Bernard E. Howard (ECF No. 50-16), at 2.

[100]  *See Swain v. City of Vineland*, 457 F.App'x. 107 (3d Cir. 2012).

[101]  *Id.* at 108.

defendant's police department, alleged that he had twice been rejected for transfer to a newly reinstated K-9 unit due to his age.[102]  On appeal, the Third Circuit affirmed the grant of summary judgment by concluding that the plaintiff failed to produce any evidence that he suffered an adverse employment action when he was not selected to be a dog handler.[103]  The *Swain* Court specifically reasoned that

> While Swain alleges that the K–9 unit is a "specialized endeavor" with opportunities for career advancement and overtime, (citation omitted), he does not contend that his salary, benefits, or prestige would have changed, or assert any specific denial of overtime. Even if the responsibilities of a K–9 sergeant are "significantly different" than those of a street crimes sergeant, (citation omitted), there is no indication that these different responsibilities are objectively better (*e.g.,* more prestigious or less burdensome). In other words, this is not a case where the transfer that was denied would, in effect, have been a promotion. Indeed, Swain relies only upon his subjective preference for the K–9 position, which is insufficient to establish an adverse employment action.[104]

Here, even if the denial of Ms. Montanez's request to transfer to the nonexistent Water Transport Division in Pennsylvania or to a Sand Coordinator position could be construed as an adverse employment action, there are no facts from which a reasonable jury could conclude that her salary, benefits, or prestige

---

[102]  *Id.* at 108–109.

[103]  *Id.* at 111.

[104]  *Id.* at 110.

would have changed, or overtime would be turned down based on this denial of transfer.[105]

Montanez next avers that she has adduced evidence satisfying a *prima facie* case of gender discrimination based on the "Stubble site" incident and her subsequent placement on administrative suspension without pay on January 22, 2012.[106] As noted throughout, an adverse employment action in the discrimination context is an action that is " 'serious enough to alter the employee's compensation, terms, conditions, or privileges of employment.' "[107] In the context of an administrative suspension, the Third Circuit held in *Jones v. Southeastern Pennsylvania Transportation Authority* that "[a] paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision."[108] Suspensions without pay, as averred in the instant action, however,

---

[105] *See Woods v. Salisbury Behavioral Health, Inc.*, 3 F.Supp.3d 238, 253 (M.D.Pa. March 12, 2014)(Caputo, J.)(granting summary judgment where plaintiff had failed to present any objective evidence that a school coordinator position for which she was rejected was better than her job as a special education teacher); *Sutton v. City of Wilmington*, Civil Action No. 12-CV-67, 2015 WL 4999593, at *4 (D.Del. Aug. 21, 2015)(granting summary judgment in part because the defendant city's failure to transfer to to a K-9 unit was not an adverse employment action where the work hours, wage, and overtime opportunities available for a K9 Handler nearly mirror those of his current position).

[106] Pl.'s Br. at 5.

[107] *Jones v. Southeastern Pa. Trans. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

[108] *Id.*

qualify as adverse employment actions for purposes of satisfying a prima facie case under a substantive discrimination claim.[109]

Ms. Montanez nevertheless fails to put forward evidence showing that this action was taken under circumstances that give rise to an inference of unlawful discrimination—the fourth prong of a *prima facie* case. To satisfy this element, Montanez alleges that (1) Milton Drake, a male co-employee, was treated more favorably than her when, following her internal complaints of harassment, he was suspended with pay pending an investigation, and (2) the facts and circumstances leading up to her suspension give rise to an inference of discrimination.[110] These arguments, however, fail to establish an inference of discrimination.

First, to compare her treatment to that of employees outside her protected class, Ms. Montanez must show that she and the comparator employee are similarly situated in all relevant respects.[111] "[W]hether a factor is relevant for purposes of a similarly situated analysis must be determined by the context of each case. "[112] For example, in disciplinary cases, "in order for an co-employee to be an appropriate comparator she should hold a similar position, report to the same

---

[109] *Seeney v. Elwin, Inc.*, 409 F. App'x. 570, 574 (3d Cir. 2011)(holding that "a three-day suspension without pay may be considered an adverse employment action" for the purpose of a Title VII disparate treatment claim).

[110] Pl.'s Br. at 5.

[111] *See Houston v. Easton Area Sch. Dist.*, 355 F.Appx. 651, 654 (3d Cir. 2009) (citation omitted).

[112] *Id.*

supervisor, possess a similar disciplinary record, and engage in the same type of misconduct as the plaintiff."[113]  "Whether a comparator is truly similarly-situated to the plaintiff is an issue of law."[114]

Here, within the context of this case, the Court cannot find that Milton Drake is a proper comparator sufficient to raise an inference that Montanez's suspension without pay was the result of discriminatory animus.  I first note that there are no facts demonstrating that Drake, a sand coordinator, and Montanez, a driver, occupied the same or a similar position.[115]  In fact, it is averred that Drake directed Montanez while she was at his site of supervision.[116]  Second, the conduct underlying each employee's suspension is significantly different, and Ms. Montanez has adduced no evidence demonstrating that she shared a disciplinary record similar to Drake.[117]  In Drake's circumstance, he was suspended pending an internal investigation of harassment against Montanez.  Montanez, however, was

---

[113]  *Opsatnik v. Norfolk Southern Corp.,* 335 F.Appx. 220, 223 (3d Cir. 2009).

[114]  *Moore v. Shinseki*, 487 F.App'x. 697, 698 (3d Cir. 2012) (citation omitted).

[115]  *Martin v. Pachulski, Stang, Ziehl, Young & Jones, P. C.*, 551 F.Supp.2d 322, 329 n. 2 (D.Del. 2008) (employees who did not hold the same positions were not comparably situated).

[116]  Dep. of Milton Drake (ECF No. 44-4) at 8:18-24; *see also* Dep. of Jason Drake (ECF No. 44-5) at 14:16-15:10 (explaining the role of sand coordinators in telling drivers that they needed another load of sand and where said load was needed).

[117]  *See Popko v. Penn State Milton S. Hershey Medical Center*, Civil Action No. 13-CV-1845, 2017 WL 1078158, at *8 (M.D.Pa. Mar. 22, 2017)(Kane, J.) (finding that that proposed comparators were not similarly situated where they lacked similar pre disciplinary records).

suspended pending an investigation into her alleged improper billing of detention time against MBWS sole client in Pennsylvania—Schlumberger.[118]

Similarly, I do not find that the facts and circumstances leading up to Ms. Montanez's suspension give rise to an inference of discrimination. First, while Ms. Montanez testified that she heard from others that Milton Drake expressed that he did not want females on the site, she admitted in her deposition that she had never heard any comments firsthand.[119] Furthermore, examination of the deposition testimony of other employees reveals no evidentiary support for that contention.[120] Second, while Ms. Montanez avers that a co-worker, Will Sanders, falsified her time sheets at the Stubble site, I note that he did not make the ultimate determination concerning her suspension, nor is there evidence which meets the requirements for the imposition of cat's paw liability, as advanced by Ms. Montanez.

The subordinate bias, or "cat's paw," theory states that an employer can be held liable for discrimination when a non-biased decision-maker is influenced by a

---

[118] *See Opsatnik*, 335 F. App'x. at 223 ("while 'similarly situated' does not mean identically situated, purported comparators must have committed offenses of 'comparable seriousness'").

[119] Dep. of Marissa Montanez (ECF No. 44-3) at 31:7-10; 32:21-25.

[120] *See* Dep. of Matthew Baker (ECF No. 44-6) at 12:19-22 (stating that he never heard Milton Drake make disparaging comments about Ms. Montanez); Dep. of Jason Drake (ECF No. 44-5) at 62:16–63:3 (stating that he does not recall anyone saying that Ms. Montanez could not do her job because she was a woman or that she should be retaliated against because she made a complaint); Dep. of Don Smith (ECF No. 44-7) at 23:6-11 (stating that he does not recall any instance of Milton Drake making a negative comment about Ms. Montanez).

biased managerial employee.[121]  However, when an employee alleges that a **non-supervisory** employee motivated by discriminatory animus influenced a non-biased decision-maker, liability can still attach to the employer if certain conditions are met.  In *Burlington v. News Corporation*, the Honorable R. Barclay Surrick found that a plaintiff "can establish a genuine issue of material fact on a cat's paw theory of liability if he establishes that one or more of his nonsupervisory coworkers: (1) performed an act motivated by discriminatory animus; (2) the act was intended by the coworker to cause an adverse employment action; (3) that act is a proximate cause of the ultimate employment action, (Citation omitted); and either (a) defendants acted negligently by allowing the co-worker's acts to achieve their desired effect though they knew (or reasonably should have known) of the discriminatory motivation, (citation omitted); or (b) the coworker was aided in accomplishing the adverse employment action by the existence of the agency relation."[122]

In the instant matter, Ms. Montanez fails to offer evidence establishing liability based on co-worker bias.  First, I note that, while Ms. Montanez has now alleged that Sanders altered[123] her ticket at the "Stubble" site by adding notes, and

---

[121]  *See McKenna v. City of Philadelphia*, 649 F.3d 171 (3d Cir. 2011).

[122]  55 F. Supp.3d 723, 738-39 (E.D.Pa. 2014).

[123]  I further question the significance of the alleged "notes" which Sanders placed on the ticket, given that there is no allegation that he altered the hours to be charged to Schlumberger. *See* Dep. of Marissa Montanez (ECF No. 44-3) at 57:20-58:12.

therefore effectively imputed his discriminatory animus to MBWS, the factual

record indicates that she failed to dispute her billing time immediately following

her suspension despite being given that opportunity.  Specifically, in her

comprehensive email of January 23, 2012 concerning the Stubble site incidence,

Ms. Montanez focused her allegations on having been given "incorrect" directions,

and essentially conceded that she sought payment for the time she was lost.[124]

Indeed, in this email, Ms. Montanez wrote the following:

> After I unloaded, George Sullenberger signed my paperwork **but only allowed for detention time I had spent at the truck stop**. My belief is that George Sullenberger, Will Sanders, and Ed Metzinger were equally responsible for my having been lost for an exorbitant amount of time, due to their failure to communicate, and having given me the WRONG directions. **To penalize me by refusing to pay is a violation of OSHA wage requirements and Ethics. George Sullenberger suggested I call Don Smith**.[125]

Second, even accepting both the veracity of Ms. Montanez's otherwise

unsupported allegations and Mr. Sanders' reputed discriminatory animus,[126] I

nevertheless note the absence of facts demonstrating that defendant acted

negligently by allowing the co-worker's acts to achieve their desired effect though

---

[124] *See* January 23, 2012 Email from Marissa Montanez to Sarah Boltz (ECF No. 50-18).

[125] *Id.* (emphasis added).

[126] Federal Rule of Civil Procedure 56(c)(1) states that in order for the nonmovant to establish a genuine dispute of material fact she must "cit[e] to particular parts of materials in the record" or "showing that the materials cited [by the movant] do not establish absence or presence of a genuine dispute." A nonmoving party, therefore, "may not simply sit back and rest on the allegations in its complaint." *Corneal v. Jackson Twp.*, 313 F.Supp.2d 457, 464 (M.D.Pa. 2003), *aff'd*, 94 F.App'x. 76 (3d Cir. 2004).

they knew (or reasonably should have known) of the discriminatory motivation, or that the coworker was aided in accomplishing the adverse employment action by the existence of the agency relation. Specifically, following the "Stubble" site incident, MBWS conducted an internal investigation to confirm the conclusion of customer Schlumberger that Ms. Montanez improperly billed them.[127]

Furthermore, I note that following the "Stubble" site incident, MBWS again hired a private investigator to conduct a second investigation into allegations of harassment by Sanders, including an allegation by Ms. Montanez that she overhead from another employee that Sanders said he got her fired from Schlumberger sites.[128] Following interviews with five individuals, that private investigator again found insufficient evidence to support Ms. Montanez's claims against Sanders.[129] Given these investigations, the factual record therefore lacks any evidence that Sanders' discriminatory animus, if it existed, proximately caused the adverse employment action suffered.

  b.    Legitimate, Non-discriminatory Reason and Pretext

Even assuming *arguendo* that Montanez were successful in adducing a prima facie case of gender discrimination under Title VII, MBWS has nevertheless proffered legitimate non-discriminatory reasons for each of the alleged adverse

---

[127] Def.'s SUMF ¶ 34, at 6; Pl.'s Answer ¶ 34, at 5.

[128] *See* Investigative Report of Bernard Howard (ECF No. 50-20) at 10.

[129] *See* Investigative Report of Bernard Howard (ECF No. 50-20) at 16.

employment actions.  At the outset, I note that a defendant's burden at this stage of the *McDonnell Douglas* framework is "'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'"[130]

Here, MBWS asserts the following nondiscriminatory reasons for the alleged adverse employment actions suffered by Ms. Montanez.  First, concerning their alleged failure to transfer Montanez to the Water Transport Division, MBWS avers that it did not employ such drivers in Pennsylvania.  Rather, as previously explained, it only retained non-employee independent contractors in that division.[131]  Second, MBWS states that it did not transfer Montanez to the Sand Coordinator position because she was not qualified for this position.  MBWS specifically argues that this position requires its occupant to regularly visit oil sites which included the Schlumberger site to which Montanez was banned.[132]  Third, and finally, MBWS submits that Montanez's administrative suspension without pay was warranted given that she incorrectly billed their client Schlumberger for detention time incurred during the "Stubble" site incident.[133]

---

[130] *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

[131] Def.'s Br. at 13.

[132] *Id.* at 14.

[133] *Id.* at 14.

Because "the defendant need not prove that the articulated reason actually motivated its conduct" at this stage of litigation,[134] I find that MBWS has met its burden of production at this stage of the framework. The burden therefore shifts back to the plaintiff to show, by a preponderance of the evidence, that this reason is pretextual.[135] Our Court of Appeals has explicitly instructed district courts who are disposing of a summary judgment motion in the employment discrimination setting as follows:

> [T]o defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. In other words, . . . a plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.
>
> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

---

[134]  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

[135]  *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015).

To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons. While this standard places a difficult burden on the plaintiff, it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decision-making by the private sector in economic affairs.[136]

Based on the above direction, I find that the summary judgment record contains no evidence from which a reasonable jury could conclude that MBWS's stated reasons for Montanez's suspension was simply a pretext for discrimination. In her brief in opposition to the instant Motion for Summary Judgment, Ms. Montanez avers that much of the evidence adduced to satisfy the *prima facie* of gender discrimination overlaps with the pretext analysis.[137] Specifically, Ms. Montanez argues that pretext is shown through (1) Milton Drake's more favorable disciplinary treatment, (2) Milton Drake's comment referring to Montanez as "little

---

[136] *Fuentes v. Perskie*, 32 F.3d 759, 764–65 (3d Cir. 1994) (Becker, C.J.) (internal citations and quotations omitted) (emphasis in original).

[137] *See Doe v. C.A.R.S. Prot. Plus, Inc.*,527 F.3d 358, 370 (3d Cir. 2008) ("[T]he prima facie case and pretext inquiries often overlap. As our jurisprudence recognizes, evidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the McDonnell Douglas formula requires us to ration the evidence between one stage or the other.").

lady," and (3) MBWS' failure to offer her a job in the Water Transport Division of North Dakota, or Don Smith's failure to recommend her for the Sand Coordinator position.[138]

These allegations cannot satisfy either of the above *Fuentes* prongs. First, concerning Montanez's advancement of Milton Drake as a similarly situated employee who was subject to more favorable discipline, I note that this argument was previously rejected as a matter of law during my analysis of Ms. Montanez's prima facie case. Second, even when accepting the veracity of Montanez 's allegation that Drake called her "little lady," I note that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."[139] In considering whether they are probative of discrimination, the following factors are applicable: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement."[140] Here, this stray remark by Milton Drake fails to demonstrate pretext because the developed factual record demonstrates that he was a non-

---

[138] Pl.'s Br. at 17.

[139] *Fuentes*, 32 F.3d at 767 (quoting *Ezold*, 983 F.2d at 545).

[140] *Parker v. Verizon Pennsylvania, Inc.*, 309 F.App'x. 551, 559 (3d Cir. 2009)(citing *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997)).

decision maker concerning Montanez's employment or prospective transfer and exercised, at most, indirect authority over her in his position as a Sand Coordinator while she was unloading at his site.[141] Furthermore, Ms. Montanez has not placed this single comment within a temporal proximity to an alleged adverse employment action.

Third, concerning MBWS's failure to offer her a job in the Water Transport Division of North Dakota and Don Smith's failure to recommend her for the Sand Coordinator position, I note an utter paucity of evidence either "(i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.[142] I specifically note that the undisputed facts indicate that (1) MBWS did not employ water transport drivers in Pennsylvania and there is no evidence indicating that Montanez pursued such a position in another state and was denied,[143] and (2) Ms.

---

[141] Dep. of Milton Drake (ECF No. 44-4) at 8:18-24; *see also* Dep. of Jason Drake (ECF No. 44-5) at 14:16-15:10 (explaining the limited role of sand coordinators in telling drivers that they needed another load of sand and where said load was needed).

[142] *Fuentes*, 32 F.3d at 764–65.

[143] *See* Email from Human Resources Manager Sarah Boltz to Montanez (ECF No. 44-1)("You can find a list of available and open positions by visiting our website, www.missouribasinwell.com and clicking "Apply Online". I've attached a Transfer Request Form, all transfer requests are reviewed by management for qualifications, experience, etc. and must receive executive approval.").

Montanez was not recommended for a Sand Coordinator position because she was unqualified.[144]

In sum, the undisputed facts indicate that Montanez has failed to establish both a *prima facie* case of discrimination and adduce any evidence that MBWS's legitimate, nondiscriminatory reasons are pretext. I therefore find that no genuine dispute as to material fact precluding summary judgment in favor of MBWS on Montanez's gender discrimination claim.

### 2. Title VII Retaliation

Section 704(a) of Title VII forbids an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation . . . under this subchapter."[145] In *Burlington Northern and Santa Fe Ry. Co. v. White*, the Supreme Court of the United States discussed the different purpose and language of the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964.[146] Specifically, the Court explained that, while the anti-discrimination provision "seeks to prevent injury to

---

[144] *See* Dep. of Don Smith (ECF No. 44-7), at 16:20-23 (expressing that a Sand Coordinator typically works on site for multiple weeks at a time); *see also* Investigative Report (ECF No. 50-16) (noting that Montanez expressed that she is a part time employee limited in the number of hours she can work).

[145] 42 U.S.C. § 2000e-3(a).

[146] *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–63 (2006).

individuals based on who they are, *i.e.,* their status," the anti-retaliation provision "seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct."[147]

    a.    *Prima Facie* Case

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) she was engaged in protected activity; (2) she suffered an adverse employment action subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the adverse activity.[148] Importantly, a plaintiff must prove but-for causation; that is, he or she must demonstrate "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."[149] Finally, as with discrimination claims, if a plaintiff establishes a *prima facie* case of retaliation, "'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'"[150] "To survive a motion for summary judgment in the employer's favor, a plaintiff

---

[147] *Id.* at 63.

[148] *See Woodson v. Scott Paper Co.*, 109 F.3d, 913, 920 (3d Cir. 1997).

[149] *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

[150] *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)(quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).

must produce some evidence from which a jury could reasonably reach these conclusions."[151]

Conceding that Montanez's internal complaint of harassment constitutes a protected activity under the above framework, Defendant MBWS nevertheless contests that Montanez fails to establish a materially adverse employment action.[152] It specifically avers that alleged materially adverse actions of (1) not being transferred to the Water Transport division; (2) having her paperwork in December 2011 "unnecessarily and unreasonably delayed"; (3) being "given the wrong and/or incomplete directions" to the "Stubble" site on January 18, 2012; (4) being falsely accused as insubordinate by her supervisor Vince Zales while she was in the position as field safety representative; and (5) not being permitted to return to a position as truck driver or field safety representative in late 2012/early 2013 each fail as a matter of law to satisfy a *prima facie* case of retaliation under Title VII.[153] I agree.

"The scope of the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."[154] Consequently, "a plaintiff claiming retaliation under Title VII

---

[151] *Id.* (citing *Fuentes*, 32 F.3d at 764).

[152] Def.'s Br. at 18.

[153] *Id.*

[154] *Burlington Northern*, 548 U.S. at 67.

- 40 -

must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[155] "In evaluating whether actions are materially adverse, we must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.' "[156]

Here, Montanez's *allegations* that (1) her paperwork in December 2011was "unnecessarily and unreasonably delayed," and (2) she was falsely accused of being insubordinate by her supervisor Vince Zales while she was in the position as field safety representative fail to meet that threshold of materially adverse actions. These actions amount to no more than everyday difficulties which an employee must attend to in the ordinary course of her employment.

In *Burton v. Pennsylvania State Police*, the Honorable Sylvia H. Rambo of this Court granted defendant's motion for summary judgment, finding that several small actions, including a temporary reassignment, a threat of termination, a reprimand, and an allegation of a failure to fully investigate an internal

---

[155] *Moore*, 461 F.3d at 341.

[156] *Id.* at 346 (citing *Burlington*, 548 U.S. at 68).

discrimination claim did not constitute adverse action.[157]  While it is true that actions which are not materially adverse by themselves can be materially adverse when considered together,[158] I do not find that this threshold has been met in the instant action based on the factual record.  Quite simply, no reasonable jury could determine that such miniscule actions, even taken together, are materially adverse such that they would dissuade a reasonable worker from making or supporting a charge of discrimination.[159]

Similarly, I find that neither (1) MBWS's "failure" to transfer Montanez to the Water Transport division, nor (2) her not being permitted to return to a position as truck driver or field safety representative in late 2012/early 2013 can satisfy a *prima facie* case of retaliation.  First, while a failure to transfer can constitute a materially adverse employment action, I again note, as above, that MBWS did not employ such drivers in Pennsylvania, and that there is no factual evidence that Ms.

---

[157]  990 F.Supp.2d 478, 510 (M.D.Pa. 2014).

[158]  *See Brennan v. Norton*, 350 F.3d 399, 422 n. 17 (3d Cir.2003) ("The cumulative impact of retaliatory acts may become actionable even though the actions would be de minimus if considered in isolation.").

[159]  *See, e.g.*, *Jackson v. Hoopes Turf Farm*, Civil Action No. 12-CV-01719, 2015 WL 1548876, at *7 (M.D.Pa. Apr. 7, 2015)(Brann, J.)(finding that alleged retaliatory acts of (1) not being paid for four hours of waiting time when her truck broke down; (2) having her shift cancelled without her knowledge so that she had already driven into work; (3) not being notified when she was granted time off; (4) not receiving a hotel room like two other drivers on a trip; (5) not being given a letter of recommendation from Mr. Hoopes; (6) being assigned a truck on one trip with a pump that kept freezing; and (7) learning that she had not been called into work when five trucks were working at a site, taken together, were not materially adverse actions); *Shingara v. Skiles*, Civil Action No. 04-CV-0621, 2007 WL 210800, at *7 (M.D.Pa. Jan. 24, 2007)(Conner, J.)(finding that "ineffectual communications," equivalent to oral reprimands, do rise to the level of actionable retaliation).

Montanez subsequently applied for and was rejected for an out of state position.[160]

Second, there is no evidence that Ms. Montanez's requests for a truck driver or field safety representative position were affirmatively denied by MBWS. Rather, the factual record indicates that Montanez's employment ended rather slowly, as she failed to abide by MBWS's requests for documentation concerning her ability to work with a reasonable accommodation.[161]

Finally, Ms. Montanez cannot establish a *prima facie* case of retaliation under Title VII based on the "Stubble" site incident and her subsequent suspension without pay. I find that failure to be based on a lack of causal connection—the third prong of the *prima facie* case. A plaintiff satisfies this prong by adducing evidence demonstrating a causal link between the protected activity and the adverse employment action suffered.[162] This link may be shown by evidence of an "unusually suggestive" temporal proximity between the protected activity and the adverse action.[163] In the absence of such suggestive temporal proximity, however, a plaintiff may nevertheless raise an inference of causation by pointing to evidence

---

[160] Def.'s Br. at 13.

[161] *See* September 26, 2012 Email from Sarah Boltz to Marissa Montanez (ECF No.50-21)("At this point, without a non-driving position available, we will need to keep you on leave until we receive the additional information from you and your provider.").

[162] *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).

[163] *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)).

of intervening antagonistic conduct or animus, inconsistencies in the employer's rationale, or other record evidence which implies retaliatory motive.[164]

In *Blakney v. City of Philadelphia*, the Honorable Thomas M. Hardiman, writing for our Court of Appeals, summarized the law in this circuit on the issue of temporal proximity:

> We have found that a temporal proximity of two days is unusually suggestive of causation, *see Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989) (reversing summary judgment for the defendant when plaintiff was fired two days after his employer received notice of his EEOC complaint), but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive, *see Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (finding that "where the temporal proximity is not so close as to be unduly suggestive," the appropriate test is "timing plus other evidence"); *see also Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (two months is not unusually suggestive); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (three months is not unusually suggestive).[165]

Therefore, "[u]nusually suggestive temporal proximity is typically measured in terms of days and weeks."[166]

In the instant matter, Ms. Montanez made an internal complaint of harassment on November 30, 2011. Therefore, because the "Stubble" site incident and subsequent suspension occurred on January 19, 2012, a passage

---

[164] *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).

[165] 559 Fed. App'x 183, 186 (3d Cir. 2014) (Hardiman, J.).

[166] *Hileman v. Penelec/FirstEnergy Corporation*, Civil Action No. 14-CV-1771, 2017 WL 2778562, at *10 (M.D.Pa. June 27, 2017)(Conner, C.J.).

of fifty (50) days, or approximately a month and a half, had elapsed since that date. In *Smith v. ABF Freight Systems*, the Honorable Christopher C. Conner of this Court granted summary judgment in favor of a defendant on a Title VII retaliation claim by finding that a span of a one and a half months between the protected activity and the adverse employment action taken against plaintiff was "not so unduly suggestive as to give rise to an inference of causation."[167] This finding has since been followed by other courts elsewhere within this circuit.[168] I will join that chorus.

In the absence of unusually suggestive temporal proximity, the Court must now look to the broader factual record to determine whether a "pattern of antagonism" combines with timing to substantiate an inference of causation.[169] "Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, (citation omitted), or other types of circumstantial evidence, such

---

[167] Civil Action No. 04-CV-2231, 2007 WL 3231969, at *11 (M.D.Pa. Oct. 29, 2007).

[168] *See, e.g., Thompson v. Kellogg USA, Inc.*, Civil Action No. 12-CV-0258, 2014 WL 11398142, at *11 (M.D.Pa. Aug. 4, 2014), *adopted by* 2014 WL 11398142 (M.D.Pa. Sept. 29, 2014), *affirmed by* 619 F.App'x. 141 (3d Cir. 2015); *Hileman*, 2017 WL 2778562, at *10; *Roseberry v. City of Philadelphia*, Civil Action No. 14-CV-2814, 2016 WL 826825, at *14 (E.D.Pa. Mar. 3, 2016).

[169] *LeBoon*, 503 F.3d at 232.

as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole."[170]  Here, Ms. Montanez attempts to satisfy this "pattern of antagonism" through the cat's paw theory liability and thus the alleged discriminatory animus of co-worker Will Sanders. Having previously addressed the failures of this argument in disposing of her gender discrimination claim, I will not rehash that reasoning here.  This argument is unavailing.[171]

Based on the foregoing, I find that the undisputed facts indicate that Ms. Montanez has failed to establish a *prima facie* case of Title VII retaliation.[172]  As

---

[170]  *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 302 (3d Cir. 2007).

[171]  Furthermore, while not entirely clear, Ms. Montanez appears to intimate a retaliation claim based on her filing of an EEOC complaint. However, this filing was made on June 1, 2012, and the factual record indicates that MBWS actually placed Ms. Montanez in the position of Field Safety Representation on July 9, 2012. Dep. of Marissa Montanez (ECF No. 44-3), at 61:24–62:4. She left that position after merely three weeks and any subsequent failure by MBWS to actively place her in a position cannot support a retaliation claim. As previously explained throughout, no materially adverse action occurred as any return to MBWS was delayed by Ms. Montanez's failure to provide supplemental paperwork concerning her medical condition. Dep. of Sarah Boltz (ECF No. 44-2) at 48:2–10. *See also* September 26, 2012 Email from Sarah Boltz to Marissa Montanez (ECF No.50-21)("At this point, without a non-driving position available, we will need to keep you on leave until we receive the additional information from you and your provider.").

[172]  Even if Ms. Montanez were successful in satisfying a *prima facie* case of retaliation, I nevertheless note that it would not satisfy her burden of persuasion. At step three of the *McDonnell Douglas* framework, Ms. Montanez must prove that her protected activity was the but-for cause of her supension. *See University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013)("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)"). Ms. Montanez could not meet this burden as the evidence unequivocally establishes that her suspension was the result of submitting a falsified a timesheet.

such, I therefore find that summary judgment in favor of MBWS on Ms.

Montanez's retaliation claim is appropriate.

**B.    Montanez's Disability Discrimination Claim Under the ADA**[173]

The ADA prohibits discrimination "against a qualified individual on the

basis of disability in regard to job application procedures, the hiring, advancement,

or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."[174]  When the plaintiff's allegations of

intentional discrimination are supported only by circumstantial evidence, the Court

must follow the above delineated *McDonnell-Douglas*[175] burden-shifting

framework.  Tracking this case through this framework reveals that Ms.

Montanez's claim cannot make it past the required *prima facie* case of disability

discrimination, and, in any event, would fail at every step thereafter.

A *prima facie* case of disability discrimination – the first step of the

*McDonnell-Douglas* framework – requires that plaintiff establish (1) that she is

disabled within the meaning of the ADA, (2) that she is otherwise qualified for the

job, with or without reasonable accommodations, and (3) that she was subjected to

an adverse employment decision as a result of discrimination.[176]  Here, Ms.

---

[173]  I note that in Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, she withdraws her ADA retaliation claim. ECF No. 50, at 2 n. 1.

[174]  42 U.S.C. § 12112(a).

[175]  411 U.S. 792, 802–804 (1973).

[176]  *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

Montanez alleges that she was discriminated against as a result of having multiple sclerosis. This claim fails, however, because Ms. Montanez has set forth no evidence demonstrating that she is otherwise qualified for her position, with or without reasonable accommodations, or that she was subjected to an adverse employment decision as a result of discrimination.

First, Ms. Montanez cannot establish that she was qualified for the positon in question—trucker—with a reasonable accommodation.  The ADA defines a "qualified individual with a disability" as:

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment positions that individual holds or desires.[177]

Here, MBWS specifically avers that there are no disputed facts from which a reasonable jury could find that her accommodation—using single instead of double chains on her tires— was reasonable.  I agree. Specifically, I note that MBWS had a policy for all truck drivers requiring them to double chain their tires in slippery conditions and that Ms. Montanez was aware of this policy.[178]  As double chaining the tires of her truck was made an essential function of her position by modification of MBWS policy, Ms. Montanez's inability to perform that task with or without a reasonable accommodation would render her unqualified for the

---

[177]  42 U.S.C. § 12111(8).

[178]  Dep. of Marissa Montanez (ECF No. 44-3) at 74:6–20.

position.[179]  Furthermore, even assuming that Ms. Montanez were entitled to the

protections of the ADA, I note that MBWS reassigned Ms. Montanez to be a Field

Safety Representative as a reasonable accommodation due to her inability to

double chain as a trucker.[180]  Therefore, because a "reasonable accommodation"

includes "reassignment to a vacant position,"[181] this fact stands as an added

obstacle to her ability to establish a *prima facie* case of disability discrimination.

Second, even if Ms. Montanez were to establish that she was qualified for

the trucker position with or without a reasonable accommodation, she has

nevertheless failed to adduce evidence showing that she was subject to an adverse

employment action or that this adverse employment action was a result of a

disability.  ADA "[p]laintiffs must prove that they were treated differently based

on the protected characteristic, namely the existence of their disability."[182]  This

requires a showing that the disability "played a role in the employer's

decisionmaking process and that it had a determinative effect on the outcome of

that process."[183]  Here, Ms. Montanez has failed to make that showing.

---

[179] *See, e.g., Moore v. Cvs Rx Services*, 142 F.Supp.3d 321, 337 (M.D.Pa. 2015)(Brann, J.), *aff'd by* 660 F.App'x. 149 (3d. Cir. 2016)(finding that a plaintiff was not qualified to be for the position in question (piece picker), with or without a reasonable accommodation, where she could not lift over her head or climb—essential functions of the job).

[180] Dep. of Sarah Boltz (ECF No. 44-2) at 33:16–21.

[181] *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 768 (3d Cir. 2004)(quoting 42 U.S.C. § 12111(9)(B)).

[182] *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013).

[183] *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 n.4 (3d Cir. 2007).

First, at the time Ms. Montanez requested this accommodation, she was already on administrative leave stemming from the incident at the "Stubble" site, and can therefore not allege her disability influenced that determination. Second, and as noted above, MBWS accommodated Ms. Montanez's alleged inability to double chain her tires by assigning her to a position as a Field Safety Representative.[184] It was Ms. Montanez who quit that job after three weeks because of an incident that she alleged was the result of sex-based discrimination and retaliation, and not disability-based discrimination.[185] Third, following Ms. Montanez's decision to leave the FSR position, there is no evidence that she was subject to further adverse action. Rather, as explained by Ms. Boltz, a Human Resources employee for MBWS, Ms. Montanez effectively quit her position while MBWS was awaiting information concerning her need for a reasonable accommodation. Ms. Boltz specifically stated the following:

Q. Was it an indefinite suspension?

A. Until we received the information that we needed ---.

Q. And what ---?

A. --- and verification.

Q. And what information was that that you needed?

---

[184] Dep. of Sarah Boltz (ECF No. 44-2) at 33:16–21.

[185] Dep. of Marissa Montanez (ECF No. 44-3) at 63:5–66:15.

> A. There were, as I mentioned previously, some inconsistencies that
> we wanted to clear up or get more information on.[186]

In fact, during this process and up until the time of her resignation, Ms. Montanez remained an employee of MBWS.[187]

Ms. Montanez has failed to allege facts from which a reasonable juror could find she was discriminated against due to a disability. Specifically, due to her inability to allege facts demonstrating her qualifications and that she otherwise suffered an adverse employment action, I find that Ms. Montanez has failed to satisfy a *prima facie*[188] case of disparate treatment. Summary judgment will be entered in favor of MBWS on this claim.

### C. Montanez's Discrimination and Retaliation Claim Under the Pennsylvania Human Relations Act

Finally, Defendant argues that Ms. Montanez's claims under the PHRA must be dismissed along with those under Title VII and the ADA. Plaintiff of course resists that outcome arguing that genuine disputes of material fact precluding

---

[186] Dep. of Sarah Boltz (ECF No. 44-2) at 48:2–10. *See also* September 26, 2012 Email from Sarah Boltz to Marissa Montanez (ECF No.50-21)("At this point, without a non-driving position available, we will need to keep you on leave until we receive the additional information from you and your provider.").

[187] *Id.* at 48:20-22.

[188] I further note that, in the event Ms. Montanez were successful in alleging a prima facie case of disability discrimination, there is no evidence from which a reasonable juror could either disbelieve MBWS's proffered legitimate, non-discriminatory reasons, or believe that invidious discrimination motivated their actions. Indeed, full review of the factual record indicates that MBWS had previously accommodated Ms. Montanez by supplying her an inverter for a refrigerator within her truck to keep medication cold. *See* Dep. of Don Smith (ECF No. 44-7) at 10:15–23.

summary judgment on her other claims foreclose that outcome here. Having previously found each of Ms. Montanez's claims insufficient for presentation to a jury, I agree with MBWS. Ms. Montanez's claims under the PHRA for discrimination and retaliation, coextensive with those under Title VII and the ADA, will therefore be dismissed.[189]

## V.  CONCLUSION

Based on the above reasoning, Defendant Missouri Basin Well Services' Motion for Summary Judgment will be granted in its entirety. The Clerk of Court is directed to close this case.

An appropriate Order follows.


BY THE COURT


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge

---

[189] *See Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996)(noting that claims under the PHRA are interpreted coextensively with Title VII claims); *Macfarlan v. Ivy Hill SNF, LLC,* 675 F.3d 266, 274 (3d Cir. 2012) (noting that the Rehab Act, ADA, and PHRA are to be interpreted consistently, and with the same standard for determination of liability).